# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MICHAEL HENDRICKS,**
　　　　　　**Plaintiff,**

　　**v.**　　　　　　　　　　　　　　　　**Case No. 04-C-1043**

**JO ANNE B. BARNHART,**
**Commissioner of the Social Security Administration,**
　　　　　　**Defendant.**

---

## DECISION AND ORDER

### I. BACKGROUND

In this action, pro se plaintiff Michael Hendricks seeks judicial review of the decision of defendant Jo Anne Barnhart, Commissioner of the Social Security Administration ("SSA"), denying his application for Supplemental Security Income ("SSI"). Due to the length of time this matter has been pending, I will set forth the full procedural history.

Plaintiff's father initially applied for SSI on plaintiff's behalf on March 1, 1995 when plaintiff was 17 years old, alleging disability due to mental and emotional problems (Tr. at 154), but the SSA denied his claim initially and on reconsideration (Tr. at 51-54; 97-98; 107-08).[1] Plaintiff requested a hearing, which was held on March 29, 1996 before Administrative Law Judge ("ALJ") Marsha Stroup. On May 15, 1996, ALJ Stroup issued a decision denying his claim. (Tr. at 58-68.) On November 14, 1997, the Appeals Council remanded for consideration of new medical evidence submitted after the hearing. (Tr. at 125-27.) ALJ

---

[1] I will cite the administrative transcript compiled by the SSA as "Tr. at ___" and the record before this court as "R. __ at ___."

Stroup held another hearing on February 23, 1998, but plaintiff did not appear because he was on house arrest related to a criminal charge. (Tr. at 492-94.) The ALJ gave plaintiff the opportunity to appear and testify at a supplemental hearing, but he waived his right to do so, and on June 16, 1998 ALJ Stroup issued a decision again denying plaintiff's claim. (Tr. at 81-96.) On September 18, 2000, the Appeals Council remanded a second time because the tape of the March 29, 1996 hearing (upon which ALJ Stroup relied) had been lost. (Tr. at 141-42.) The matter was again scheduled for a hearing before ALJ Stroup on January 29, 2001, and plaintiff's father appeared on his behalf, but the matter was adjourned to allow him time to find a lawyer. (Tr. at 450-60.) Plaintiff, represented for the first time by counsel, then appeared and testified before ALJ Margaret O'Grady on April 5, 2001.[2] (Tr. at 464-91.) At the conclusion of the hearing, ALJ O'Grady elected to send plaintiff for a psychiatric evaluation, and the matter was continued. (Tr. at 489.) The evaluation was completed on August 16, 2001 (Tr. at 396), and the matter was set on for a continued hearing on January 16, 2002, but plaintiff failed to appear, apparently because he had gone to Florida to avoid a warrant for his arrest. ALJ O'Grady agreed to continue the hearing. (Tr. at 434-49.) Plaintiff then appeared and testified before ALJ O'Grady on May 16, 2002. (Tr. at 406-33.) On September 24, 2002, ALJ O'Grady issued a decision again denying the claim. (Tr. at 11-16.) This time, the Appeals Council denied plantiff's request for review (Tr. at 5), making the ALJ's September 24, 2002 decision the final decision of the SSA for purposes of review in this court. See Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005).

---

[2]Apparently, ALJ Stroup recused herself after the January 29, 2001 proceeding. (See Tr. at 454-56.)

Case 2:04-cv-01043-LA   Filed 12/14/05   Page 2 of 30   Document 24

In the present action, plaintiff argues that the ALJ's decision should be reversed because she failed to fully and fairly develop the record. The Commissioner responds that the ALJ properly developed the record and that her decision is supported by substantial evidence and free of harmful legal error. The matter has been fully briefed and is ready for decision.

## II. APPLICABLE LEGAL STANDARDS

### A. Disability Standard

The SSA has adopted a sequential five-step test for determining whether a claimant is disabled.[3] See 20 C.F.R. §§ 404.1520 & 416.920. The first step is to determine whether the claimant is presently engaged in substantial gainful activity ("SGA"). If not, the ALJ moves on to the second step, which is to determine whether the claimant has a "severe" impairment or combination of impairments. An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant has a severe impairment, the ALJ must determine at step three whether any of the claimant's impairments are listed by the SSA as being so severe as to preclude SGA. These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings"). If the claimant can demonstrate a listed impairment, he will be found disabled.

--------------------

[3]Because plaintiff was 17 years old when he initially applied but had turned 18 by the time of the first hearing, ALJ Stroup in the first two decisions evaluated the claim under the standards applicable to child and adult claimants. (Tr. at 66-68; 91.) ALJ O'Grady's decision, which is now under review in this court, evaluated the claim solely under the standard for adults. (Tr. at 11-12.) The parties point to no significant differences between the two standards for purposes of my review, so I will not address the issue further.

3

The Listings of mental impairments consist of three sets of "criteria": the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). The paragraph A criteria substantiate medically the presence of a particular mental disorder, and the paragraph B and C criteria describe the impairment-related functional limitations that are incompatible with the ability to perform SGA.[4] If a claimant satisfies the A and B, or A and C criteria, he will be considered disabled. Wates v. Barnhart, 274 F. Supp. 2d 1024, 1036 (E.D. Wis. 2003) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00); see also 20 C.F.R. § 404.1520a (discussing evaluation of mental impairments).

If the claimant's impairment does not meet or equal a Listed impairment, the ALJ must then determine the claimant's residual functional capacity ("RFC"). RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments. SSR 96-8p. The relevant mental work activities include understanding, remembering and carrying out instructions; responding appropriately to supervision and co-workers; and handling work pressures in a work setting. 20 C.F.R. §

---

[4]There are four broad areas in which the ALJ rates the degree of functional limitation: activities of daily living ("ADL's"); social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ rates the degree of limitation in the first three functional areas using a five-point scale: none, mild, moderate, marked and extreme. The degree of limitation in the fourth area is evaluated using a four-point scale: none, one or two, three, and four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. Windus v. Barnhart, 345 F. Supp. 2d 928, 931 (E.D. Wis. 2004) (citing 20 C.F.R. § 404.1520a(c)(4)).

4

404.1545(c); see also Windus, 345 F. Supp. 2d at 931 (citing POMS DI 25020.010B.3) (setting forth expanded list of mental activities involved in unskilled work).

At step four, the ALJ must determine whether, given his RFC, the claimant can perform his past work. If so, he is not disabled. If not, the ALJ must at step five determine whether the claimant is able to perform any other work in the national economy in light of his age, education and work experience. E.g., Samuel v. Barnhart, 295 F. Supp. 2d 926, 929 (E.D. Wis. 2003).

The burden is on the claimant to adduce evidence at steps one through four. However, if the claim proceeds to step five, the burden shifts to the SSA to establish that the claimant can engage in some other type of substantial gainful employment. The SSA may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of his limitations, or through the use of the "Medical-Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. However, the ALJ may not rely on the Grid to deny a claim if the claimant's attributes do not correspond precisely to a particular rule, or if non-exertional limitations (e.g., pain, or mental, sensory or skin impairments) substantially reduce the claimant's range of work. In such a case, the ALJ must solicit the testimony of a VE, although she may use the Grid as a "framework" for making a decision. E.g., Samuel, 295 F. Supp. 2d at 929.

## B. Standard of Review of ALJ's Decision

The district court's review of an ALJ's decision is limited to determining whether the decision is supported by "substantial evidence" and based on the proper legal criteria.

5

Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). Thus, where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).

However, if the ALJ commits an error of law reversal is required without regard to the volume of evidence in support of the factual findings. Id. The ALJ's decision must also demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion. Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996). Further, because social security proceedings are non-adversarial in nature, the ALJ must develop the record, medical and testimonial. Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir. 2004). Thus, the reviewing court must also analyze the ALJ's decision and the record to ensure that the ALJ adequately considered the important evidence, Brindisi v. Barnhart, 315 F.3d 783, 786 (7th Cir. 2003), built an accurate and logical bridge between the evidence and the result, Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996), and fulfilled her duty to develop the record, Flener, 361 F.3d at 448.

### III.  FACTS

**A.      Hearing Testimony**

Plaintiff and his parents appeared and testified at several hearings. The transcript of the first, held on March 29, 1996, is missing because the hearing tape was lost. However,

6

transcripts of the subsequent hearings are in the record. I will summarize the pertinent testimony from those hearings.

### 1.     February 23, 1998 Hearing

As indicated above, plaintiff was unable to appear at this hearing because he was under house arrest related to charges of first degree recklessly endangering safety, and his parents appeared in his stead. (Tr. at 494.) Plaintiff's mother testified that plaintiff was at the time enrolled in computer courses at MATC but did not regularly attend. (Tr. at 500.) She stated that plaintiff had a two-year-old daughter and spent time with her in the evenings and on weekends, and that his behavior around his daughter was always appropriate. (Tr. at 502-03.) However, plaintiff's father stated that plaintiff had gotten violent with him, and plaintiff's parents both testified that there was a lot of anger in their relationship with plaintiff. (Tr. at 504-05; 509-10.)

Plaintiff's mother testified that plaintiff tried to work but did not like authority, got into arguments, and was fired. She testified that plaintiff could be wonderful in family, social situations, but if he did not get his way he would blow up and agitate until he got what he wanted. (Tr. at 511.) She stated that plaintiff had gotten counseling over the years but it did not help. (Tr. at 512-13.) She said that prior to his recent arrest plaintiff would sleep all day and stay up all night with his friends. (Tr. at 516.)

The ALJ called a medical expert, Dr. Darrell Hischke, who, based on a review of the medical record and plaintiff's parents' testimony, under the A criteria of the Listings diagnosed plaintiff with a personality disorder (anti-social personality) – Listing 12.08; substance addiction disorder – Listing 12.09; and affective disorder on one occasion in the past, but with no evidence of an ongoing problem or major depression – Listing 12.04. (Tr.

7

at 525, 526, 528.) He noted that an MMPI test in the record revealed no evidence of depression, anxiety disorders, schizophrenia, or other major psychosis, and that the data showed it was a valid profile. (Tr. at 528-29.) Under the B criteria, Dr. Hischke found no restriction of ADL's; moderate difficulty in maintaining social functioning (slight or none without the drug and alcohol abuse diagnosis); no deficiencies in concentration, persistence and pace based on the personality disorder and "often" based on the drug and alcohol abuse; and one or two episodes of decompensation. (Tr. at 537-38.) He opined that plaintiff could not be effectively treated until he realized he had a problem (as opposed to others being unwilling to tolerate his behavior). (Tr. at 539-40.) Plaintiff's father agreed with Dr. Hischke's analysis. (Tr. at 540.)

The ALJ also called a VE, who testified that a person with no exertional limitations, capable of low stress work, with no public contact and limited interaction with co-workers, could perform the full range of sedentary, light and medium sorting work (6500 jobs), packaging work (22,000), assembly work (52,000) and inspection. (Tr. at 545-46.) If the "no public contact" condition was removed, the person could work as a sales or counter clerk, street vendor, fast food attendant, and cashier. (Tr. at 547.)

### 2. April 5, 2001 Hearing

At the initial hearing before ALJ O'Grady on the second remand, plaintiff testified that he was unmarried, had a five-year-old daughter, and lived with his parents. He stated that he was 6'3" and weighed 182 pounds, that the highest grade he completed in high school was 9th grade, but that he went back and got his HSED and attended college for one semester. (Tr. at 468-69.) He testified that his last job was as a cashier at Blockbuster Video in April of 2000. He stated that he worked there for about 1 ½ months but stopped

8

because he "just didn't like working there" and "just didn't want to go in." (Tr. at 470.)
Before that he had worked as a sub-contractor for a cable company from 1996 to 1997, and
again in 1999 and 2000. (Tr. at 470-71.) He stated that he did not know why he quit that
job: "basically I screwed up." (Tr. at 471.) He said that he had no income and was
supported by his parents. (Tr. at 471-72.)

When asked why he felt he was disabled, plaintiff stated:

> Well, it seems every time that I have a job, I go to it, I know what I'm doing, I
> have no problem doing the work, but it's, it's just those, those, those one days
> [sic] that I come back and I wake up in the morning and I don't understand
> why but I'll, I'll be up, I won't sleep through it, I'll be up, but something that
> holds me back, something that wants me, something inside me makes me
> stay there, you don't, you don't go out, you don't want to go, you can't do it,
> you don't want to go, you don't want to go. And I really don't understand why.
> . . . And I've tried, I don't understand why, but it's something that just holds me
> back.

(Tr. at 472-73.) He later testified that if he got to work he was able to get through the day.
(Tr. at 488.) He further testified that he had difficulty getting along with people he did not
know and felt that they were judging him, which made him tense. (Tr. at 481.) He stated
that about once per month he had outbursts where he could not control his anger. (Tr. at
484-85.)

As far as any physical limitations, plaintiff stated that he had torn his rotator cuff about
eight months previously but had not received any medical treatment, aside from a visit to the
emergency room where doctors took x-rays, which were normal. (Tr. at 473-74.) He stated
that he was not currently seeing a doctor and that nothing else affected his ability to work
aside from his mental block. He testified that he had been seeing Dr. Itzak Matusiak but had
to stop due to a lack of insurance. (Tr. at 474.)

9

Plaintiff stated that he watched his daughter about 50-60 hours per week, and spent the rest of his time sleeping and watching TV. (Tr. at 476-77.) He testified that he was able to care for his personal needs, cook for himself and his child, wash dishes and do laundry, clean the house, and take out the garbage. (Tr. at 477.) He said that on the weekend he went out with his friends to a bar or club. (Tr. at 478.) He denied using marijuana for the past month, but stated that he used it every weekend before that. (Tr. at 478.)

### 3. May 16, 2002 Hearing

As noted above, the matter was scheduled for a continued hearing after plaintiff's psychiatric evaluation. Plaintiff failed to appear on January 16, 2002, because he had gone to Florida. He later appeared on May 16, 2002, at the final hearing before ALJ O'Grady.

Plaintiff testified that he had gone to Florida for about a month to avoid being arrested for failure to pay child support and perhaps to make some money working for a friend. (Tr. at 409-10.) He stated that since the previous hearing he had been trying to stay away from his problems; he said that he stayed at home, and either a friend of his came over or he babysat his daughter. (Tr. at 410.) He said that his daughter was then six and that he watched her part-time, three days a week. He said that he still lived with his parents. (Tr. at 411.)

Plaintiff testified that he had no income and had not looked for any jobs. He said that he had no problem getting a job but could not keep one because he worried what others thought of him and forgot what he was told to do. He also stated that if a co-worker or manager got angry with him he would sometimes "lose it" and "feel like hurting them." (Tr. at 412.) He later testified that his problems were with other men, and that he could get along with women. (Tr. at 425.)

10

Plaintiff stated that he was receiving no psychiatric treatment and had no insurance. He said that on the 21st of that month he was planning to go to Aurora Psychiatric Hospital and "try to get committed in there for an in-patient." (Tr. at 413.) He stated that he was on no medication at the time but had taken Paxil on the prescription of Dr. Sprung for one month since the last hearing. He said that the medication made him drowsy, and he felt that it did not do anything for him. He said that he saw Dr. Sprung just one time and did not go back. (Tr. at 414.)

Plaintiff testified that his father had tried to get him back into school but he "couldn't finish up." (Tr. at 415.) He stated that he did things for his daughter like go the store and cook. (Tr. at 415.) He testified that he had about two friends and no girlfriend. He stated that he had gotten violent since the last hearing – a fight in Madison on Halloween – but was not arrested. (Tr. at 416.)

Plaintiff's father testified that he was around when plaintiff had his daughter, and that as long as he was there everything was fine. (Tr. at 420-21.) He stated that within the past year plaintiff had often lost his temper, stating that if plaintiff he did not get his way he threatened violence. (Tr. at 421.) He stated that plaintiff "doesn't want to work because he's afraid what might happen, and so am I." (Tr. at 422.) When asked for examples of this within the past year, plaintiff's father asked why the last year was essential. The ALJ instructed him to answer the question or be excused. Plaintiff's father then stated that if he could not answer the way he wanted to he would be excused, and left the hearing room. (Tr. at 422-23.)

ALJ O'Grady then called a VE, who testified that a person 23 years old, with a 12th grade education, no exertional limitations, a fair ability to concentrate and receive

11

supervision, who could perform routine, repetitive tasks, and follow simple instructions, with limited interaction with co-workers and no contact with the public, at a low stress type job, could work as a machine operator (12,000 available jobs in the greater Milwaukee area at the light and medium levels); a material handler (1000 jobs in the medium category); and stock handler (4000 jobs at the medium level). (Tr. at 428-30.) If the person could have no contact with co-workers, no jobs were available. However, the jobs the VE had previously listed involved infrequent (1/3 or less) "internal" contacts. (Tr. at 430.) She also indicated that the person could perform custodial work at night, with 2000 jobs available at the light level and 10,000 at the medium level. (Tr. at 430-31.) The VE testified that she could not give figures for jobs that involved working with women only as opposed to men. (Tr. at 432.)

## B. Medical/Documentary Evidence

Plaintiff received little medical or psychiatric treatment, and much of the documentary evidence stemmed from his problems in school and brushes with the law, in addition to the evaluations obtained by the SSA. In July 1992, when plaintiff was 15, a Multi-Disciplinary Team ("M-Team") from Milwaukee Public Schools ("MPS") conducted an evaluation. (Tr. at 257.) Plaintiff had apparently failed several subjects the previous year and was seeing a psychologist for motivation problems. (Tr. at 270.) Plaintiff told the psychologist who completed a report for the M-Team that he was not sure what caused him to fail, tending to make excuses. (Tr. at 270-71.) The psychologist wrote that plaintiff appeared to be an intelligent young man who was polite and cooperative. On testing, the psychologist noted that plaintiff had average mental ability but had difficulty concentrating and lacked motivation. (Tr. at 271.) He further noted that plaintiff was confused, lonely, anxious, and "intensely experiencing normal adolescent concerns." (Tr. at 272.) However, with support

12

from family and continued therapy, the psychologist believed that he could get back on track. (Tr. at 272.)

The M-Team report indicated that plaintiff functioned in the average range intellectually, and that his performance on standardized tests showed that he was making good progress in many areas and had weaknesses in others. Emotionally, he had some problems associated with developing independence and coping strategies. The M-Team concluded that plaintiff had no handicapping condition in the area of learning disabilities, and that his learning problems were primarily motivational. (Tr. at 259; 280.)

On January 24, 1994, when he was 16 years old, plaintiff's parents admitted him to Trinity Memorial Hospital, on referral from plaintiff's therapist, because of withdrawal, confusion, paranoid ideation, extreme depression, and suicidal ideation. (Tr. at 269; 291-92.) On mental status exam, plaintiff was withdrawn and guarded, seemed paranoid and suspicious, and his mood was very depressed. Dr. Crain Bliwas's initial assessment was possible major affective disorder with psychotic features versus schizo-affective disorder. (Tr. at 295.) Plaintiff's stay in the hospital was uneventful, and he was discharged on February 3,1994, with a diagnosis of major depression, single episode, and a prescription for Prozac. (Tr. at 269.)[5]

_____

[5]Records from Comprehensive Clinical and Consulting Services included IQ testing done in November 1994, when plaintiff was 17 and in the 11th grade, which showed plaintiff to have an IQ of 89, placing him in the low average range. (Tr. at 304.) Another test placed plaintiff in the 61st percentile in reading, 70th percentile in spelling, and 19th percentile in arithmetic. (Tr. at 306.) An MMPI test performed in February 1995 produced no diagnosis other than some personality or behavioral characteristics associated with alcohol or other drug use, which required attention in therapy. (Tr. at 315.) The record also contains some handwritten notes from Dr. Gallope at North Shore Center, but they are illegible. (Tr. at 325-28.)

In March 1994, plaintiff was arrested for operating a motor vehicle without owner's consent. (Tr. at 204-10.) In May 1994, he was charged in children's court with battery. (Tr. at 211-12.) In October 1994, a CHIPS petition was filed based on plaintiff's habitual truancy. (Tr. at 216.) In January 1995, he was found delinquent of one count of disorderly conduct and placed on probation until he reached age 18, but he failed to satisfy the conditions of supervision, including that he attend school regularly and complete a psychiatric evaluation. (Tr. at 195-200, 202.) In June 1995, he was dropped by Phoenix Alternative High School due to a lack of sincere effort and excessive absenteeism. (Tr. at 215.)

Apparently plaintiff did eventually complete the psychiatric evaluation, and on August 9, 1995, Dr. Matusiak wrote a letter to the judge presiding over plaintiff's juvenile matter, indicating that according to testing plaintiff was academically able to perform at age level. An MMPI test was essentially unremarkable, with plaintiff denying psychological conflicts. However, the test did reveal characteristics associated with substance abuse. (Tr. at 359.) Dr. Matusiak concluded that plaintiff was an intellectually capable adolescent who was experiencing significant adjustment and coping problems, yet was resistant to treatment:

> Thus, despite his father's hope that a proper diagnosis of [plaintiff's] "psychopathology" or "brain disorder," as the probable root cause of his maladaptive behavior, would give rise to a swift and effective treatment program, it appears the key is [plaintiff], himself, who must first recognize the negative ramifications of his conduct and make a meaningful commitment to change.

(Tr. at 361.)

On April 21, 1995, after his SSI application was filed, plaintiff was evaluated by Dr. William Nimmer at the behest of the SSA. (Tr. at 296.) Plaintiff denied anxiety, depression, suicidal ideation, or psychotic symptoms, and could complete all ADL's in an age-

Case 2:04-cv-01043-LA   Filed 12/14/05   Page 14 of 30   Document 24

appropriate way. (Tr. at 299.) Plaintiff's father, however, reported verbal and physical abuse and aggression. (Tr. at 299-300.) Dr. Nimmer's diagnosis was conduct disorder, mild, adolescent onset. (Tr. at 300.)

In June 1995, plaintiff's probation officer, Michael Drake, completed a questionnaire for the SSA, in which he indicated that plaintiff had a major attitude problem but no true incapacitating mental or physical problem. He stated that plaintiff cooperated when he felt like it and was high on manipulation and low on motivation. (Tr. at 222.) He wrote that plaintiff was able to understand and communicate but unwilling to accept age-appropriate responsibilities. (Tr. at 223.) Drake stated that plaintiff's job-related difficulties stemmed from his refusal to get up and look for one. He concluded that plaintiff was "not physically or mentally handicapped but has dedicated his life to sponging off his parents. His is not a danger to himself or others, but avoids any responsibility." (Tr. at 224.) Drake wrote a letter to plaintiff's parents on July 28, 1995, indicating that plaintiff's "chronic passive aggressive evasion of rules and responsibilities has made this term of supervision of little value." (Tr. at 227.)

On September 5, 1995, Dr. Timothy Henke completed a Psychiatric Review Technique form for the SSA, in which he evaluated plaintiff under Listing 12.04, Affective Disorders, and Listing 12.08, Personality Disorders. (Tr. at 241A.) The reference to 12.04 was based on a history of depression from 1994, which had improved. (Tr. at 244.) Under 12.08, Dr. Henke noted evidence of a conduct disorder. (Tr. at 246.) Under the B criteria, he found that plaintiff had moderate restriction of ADL's; slight limitation of social functioning; seldom experienced deficiencies in concentration, persistence or pace; and never experienced episodes of decompensation. (Tr. at 248.) In an accompanying mental RFC

15

assessment, Dr. Henke concluded that plaintiff was moderately limited in his ability to perform activities within a schedule and be punctual, complete a normal work day without interruptions from psychologically based symptoms, accept instructions and respond appropriately to supervision, and set realistic goals and make plans independently of others, but was not significantly impaired in any other area. (Tr. at 238-39.) Dr. Henke concluded that although plaintiff was resistant to authority and unmotivated to work, he was capable of meeting all of the basic mental demands of unskilled work. (Tr. at 240.)[6]

On April 25, 1996, Dr. Matusiak completed an RFC assessment for the SSA, in which he diagnosed plaintiff with substance abuse, cyclothymic disorder, and personality disorder, NOS. He described plaintiff's symptoms as impulse control problems, low frustration tolerance, low morale, depressed mood, with a high potential for explosive behavior. He stated that plaintiff's prognosis without treatment was poor, guarded with treatment. (Tr. at 329.) He opined that plaintiff was disabled from age-related activities because he had quit school and was unable to sustain employment due to inner agitation, impulse control, and explosiveness. (Tr. at 330.) Dr. Matusiak referred to a March 1996 MMPI, which suggested a personality disorder, with a possible cyclothymic disorder and a great proneness to the development of addictive disorder. (Tr. at 334.)

On May 19, 1997, plaintiff was cited for damage to property after he threw a screwdriver at a vehicle. (Tr. at 368.) On May 29, 1997, he was arrested for battery to his

_____

[6]Plaintiff was seen once at Comprehensive Clinical and Consulting Services later in 1995, but no records were generated from the evaluation, and plaintiff did not maintain a physician-patient relationship with that office. (Tr. at 255.)

16

father (Tr. at 369) and on July 3, 1997 he was cited for possession of marijuana. (Tr. at 371.)

On February 10, 2000, Dr. Matusiak wrote a "To Whom It May Concern" letter in which he indicated that he had recently seen plaintiff for an evaluation. He stated that he had seen plaintiff on a prior occasion, years ago, as an adolescent. At that time, plaintiff was experiencing significant behavioral and adjustment problems, and an individual therapy program was prescribed. However, plaintiff's participation in treatment was irregular and ultimately stopped. Dr. Matusiak's 2000 evaluation:

> revealed serious psychological disturbance, including elements of thought disorder, confusion, difficulties with concentration, and paranoid ideation. In addition there are indications of inadequate controls, which can give rise to episodes of volatile and acting out behavior. These symptoms are apt to be further exacerbated by substance abuse. At present Michael's treatment needs are substantially more profound than when he was initially seen at this office, with regular weekly sessions being strongly indicated, especially as he currently spends much of his time ruminating, aimlessly whiling away his time, and seems unable to sustain any form of employment or purposeful activity.

(Tr. at 139.)

On September 23, 2000, plaintiff was treated at St. Luke's Medical Center for head and neck pain after he was involved in a motor vehicle accident. X-rays of the shoulder and cervical spine were negative, he was provided pain pills, and sent home in stable and satisfactory condition. (Tr. at 390-94.) On October 29, 2000, plaintiff was seen at St. Luke's with a broken right hand and injured right ankle after he was involved in a fight. He was provided with splints and medication and discharged home. (Tr. at 385-86.) On January 1, 2001, plaintiff was seen at Froedert Memorial Hospital with injuries to his face and neck, and a fractured tooth after being involved in a fight. (Tr. at 375-83.)

17

In May 2001 and April 2002, plaintiff was apparently seen for depression and social anxiety disorder at Comprehensive Clinical and Consulting, and Aurora Psychiatric Hospital, but there are no treatment records from such visits. (Tr. at 286-87.) A May 23, 2001 note from Dr. Larry Sprung, indicated that plaintiff had just begun to be seen and was under his care for depression and social anxiety disorder. (Tr. at 395.)

On August 16, 2001, plaintiff was examined by Dr. Richard Brigham at the behest of the SSA. (Tr. at 396.) When asked why he was seeking benefits, plaintiff stated that he had no problem getting a job, but something made him not want to stay and his co-workers did not like him. He also stated that he forgot what he was doing, and his co-workers would laugh at him. He believed that he was a good father to his three-year-old daughter but not a good provider; he relied on his parents financially. (Tr. at 396.) Plaintiff stated that he was followed by Dr. Sprung for medication management and was taking Paxil, that the reason for his current treatment was excessive sleep, and that he believed that when he was depressed he slept too much. (Tr. at 397.) Plaintiff stated that his chores included cutting the lawn and cleaning up after himself. He reported visiting with his daughter several times per week and that he had several girlfriends who visited him. He stated that he enjoyed hobbies such as basketball and video games with his friends. (Tr. at 398.)

Dr. Brigham noted that plaintiff "presented in a very friendly if not gregarious manner" and did not appear depressed. (Tr. at 399.) When asked how people who knew him might describe him, plaintiff replied "that I'm a good-hearted person but that I have no direction, and that I'm lost and do not know what to do." (Tr. at 399.) Dr. Brigham opined that plaintiff appeared to be in good contact with reality and "presented as somebody who exaggerated their difficulties and who took minimal responsibility for the impact of his employment history

18

on his capacity to provide child support." (Tr. at 399.) His practical judgment appeared to be closely within normal limits. (Tr. at 399.) His fund of knowledge was well-developed. His insight was fair, and he stated that aside from a reduction in anger he had gotten nothing out of therapy. (Tr. at 400.)

Dr. Brigham concluded that plaintiff probably minimally the criteria for a conduct disorder during his adolescence. He further concluded that plaintiff did not then meet the criteria for a specific personality disorder, however, he did find that a diagnosis of personality disorder, NOS, best characterized his current functioning. This recognized that plaintiff had features of narcissistic, paranoid, and anti-social personality disorders. (Tr. at 400-01.) Dr. Brigham found that plaintiff minimally met the criteria for dysthymia but was not experiencing major depression. He concluded: "Normally, the present findings would be associated with a judgment that [plaintiff] could achieve successful competitive employment. His self-reported record suggests that when he likes the work such as employment with the cable firm, that he is able to sustain the employment for more than brief amounts of time." (Tr. at 401.) He assessed plaintiff's GAF as 70, with a high of 75 within the past year.[7] (Tr at 401.)

## IV. ALJ'S DECISION

In her September 24, 2002 decision, ALJ O'Grady concluded that plaintiff was not engaged in SGA, that he had severe impairments – personality disorder, substance abuse,

---

[7]The GAF, or Global Assessment of Functioning, is a rating of a person's psychological, social and occupational functioning. Set up on a 0-100 scale, scores above 70 reflect an individual who is functioning well; scores between 50 and 60 reflect an individual with moderate impairments, who may or may not be able to work; and scores below 50 are reserved for those with severe psychological and occupational impairment. Mason v. Barnhart, 325 F. Supp. 2d 885, 893 n.1 (E.D. Wis. 2004) (citing Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)).

conduct disorder, dysthymia, depression and social anxiety disorder – but that none met or equaled a listed impairment. (Tr. at 13.) The ALJ concluded that plaintiff retained the RFC for simple, routine, low-stress work at all exertional levels, with only limited interaction with co-workers and no public contact. (Tr. at 14.) Based on this RFC and relying on the testimony of the VE, the ALJ concluded at step four that plaintiff could not perform his past work but could perform a significant number of other jobs. (Tr. at 14-15.) She therefore found him not disabled and denied his application for SSI. (Tr. at 15-16.)

## V. DISCUSSION

### A.    Development of the Record

Plaintiff argues that the ALJ failed to develop the record in several respects.[8]  As noted above, the ALJ has a duty to fully and fairly develop the record.  However, a significant omission is usually required before the court will reverse and remand.  Luna v. Shalala, 22 F.3d 687, 692 (7th Cir. 1994).

Before turning to plaintiff's specific complaints about the ALJ, I make several observations about the record.  First, plaintiff was represented by counsel at the final hearing before the ALJ.  The "ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made his best case." Sears v. Bowen, 840 F.2d 394, 402 (7th Cir. 1988) (citing Glenn v. Sec'y of Health & Human Servs., 814 F.2d 387, 391 (7th Cir. 1987)).

---

[8]After I denied plaintiff's motion for appointment of counsel (R. 15), plaintiff submitted an "Abbreviated Pro-Se Brief In Support of Reversal/Summary Judgment." (R. 16.)  In that document, he referred to several pages in his motion for appointment of counsel (R. 14) as the basis for reversing the ALJ's decision (R. 16 at [un-paginated] 5.)

20

Second, after the matter was remanded a second time by the Appeals Council, the ALJ had before her the record of several previous hearings, at which plaintiff, his parents, and a medical expert all testified. Further, after the second remand, ALJ Stroup accommodated plaintiff and his father by adjourning the hearing so they could find counsel. ALJ O'Grady then heard testimony from plaintiff and, after adjourning the matter to obtain a psychiatric evaluation, scheduled a supplemental hearing, at which plaintiff failed to appear because he had traveled to Florida to avoid an arrest warrant. Rather than dismiss or transfer the matter, ALJ O'Grady agreed to adjourn the case so plaintiff could appear, and she heard from him (and his father) again on May 16, 2002. The hearing transcripts show that ALJ O'Grady engaged in a searching inquiry at these hearings, questioning plaintiff about his mental condition and daily activities, treatment he had received and medications prescribed, and his efforts to find and keep a job. See Luna, 22 F.3d at 693 (finding that the ALJ sufficiently developed the record where she extensively queried the claimant as to his pain, medication, and activities).

Finally, the record before ALJ O'Grady contained the reports of two consultative psychiatric examinations obtained by the SSA (Tr. at 296, 396), as well as the reports of consultants who had reviewed the record (Tr. at 234-49). In sum, the ALJ made reasonable efforts to ensure that the record, testimonial and medical, was complete, and that she had sufficient information to make an informed decision. See, e.g., Flener, 361 F.3d at 448 (noting that, although ALJ has a duty to develop the record, the primary responsibility for producing medical evidence remains with the claimant, and the court must generally respect the ALJ's reasoned judgment of how much evidence to gather); see also Musgrave v.

21

<u>Sullivan</u>, 966 F.2d 1371, 1377 (10th Cir. 1992) (noting that ALJ must fully develop record but is not the claimant's lawyer).

## B.    Plaintiff's Specific Complaints

Plaintiff points to several alleged failures on the part of the ALJ, but I find that none are significant.

First, he contends that the ALJ failed to consider a psychiatric evaluation completed at Aurora Behavioral Health Services on July 29, 2002.  (R. 14 at 3.)  At the May 16, 2002 hearing, plaintiff told the ALJ that he was going to Aurora for an assessment on the 21st of that month.   (Tr. at 413.)   In his brief, plaintiff states that the evaluation had to be rescheduled to July 29, 2002 for financial reasons, and that the evaluation was faxed to ALJ O'Grady on August 18, 2002, prior to the issuance of her decision on September 24, 2002.[9] (R. 14 at 3.)  Nevertheless, he states that the only post-hearing document admitted into the record was a June 19, 2002 submission from counsel.  (Tr. at 402.)

At the conclusion of the May 16, 2002 hearing, the ALJ agreed to keep the record open for 30 days.  (Tr. at 432.)  The submission plaintiff's father faxed in August was thus well-outside the time set by the ALJ.  The court must respect the ALJ's decision as to how much evidence to collect, including her decision as to how long (if at all) to leave the record open after the hearing.  <u>See, e.g.</u>, <u>Atchison v. Sec'y of Health & Human Servs.</u>, No. 84-3506, 1985 U.S. App. LEXIS 14437, at *6 (6th Cir. May 9, 1985) (affirming ALJ's refusal to keep record open because there were no extenuating circumstances justifying a post-hearing delay); <u>Wright v. Barnhart</u>, No. 4:04-CV-0215, 2005 U.S. Dist. LEXIS 15452, at *16-17 (S.D.

_____

[9]The assessment, as well as a fax cover sheet, are attached to plaintiff's motion. (R. 14.)

22

Ind. July 25, 2005) (holding that ALJ did not abuse his discretion by refusing to keep record open beyond 30 days for submission of medical records). This is particularly true where, as here, the matter has been pending for some time, and the claimant had ample opportunity to submit medical evidence supporting his claim. Aside from the bald claim in his brief that he had to post-pone the assessment from May to July due to financial reasons (a claim that is contrary to plaintiff's testimony at the May 21, 2002 hearing that the assessment at Aurora was free (Tr. at 420)), plaintiff offers no reason why he could not get the report in on time. In his reply submission, plaintiff argues that the ALJ was advised that he was getting an assessment and thus should have left the record open. (R. 23 at [un-paginated] 4.) However, plaintiff stated at the hearing that the assessment was to occur later that month. The ALJ gave him 30 days to get the report in. I cannot fault the ALJ for closing the record prior to August 18, the date plaintiff states he faxed the report, which was about 90 days after the hearing. Therefore, I find that the ALJ did not err in declining to consider this evidence (assuming she was even aware of it before the decision issued).[10]

---

[10]The court generally cannot reverse an ALJ based on evidence that was not before her. Eads v. Sec'y of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993). Thus, I cannot consider the Aurora assessment myself. The court may, in some cases, remand for consideration of "new and material evidence" under § 405(g), sentence six. Plaintiff mentions sentence six in his reply submission (R. 23 at [un-paginated] 1), but not in his main brief. Thus, I conclude that he has not properly requested a sentence six remand. See id. Even if he had, I cannot conclude that the Aurora assessment was "new" or "material." "New" evidence is evidence not in existence or available to the claimant at the time of the administrative proceeding. Jens v. Barnhart, 347 F.3d 209, 214 (7th Cir. 2003). Although the Aurora report had not yet been prepared at the time of the ALJ's decision, as in Jens, "the information summarized in the report had long been in existence." Id. There is no reason why plaintiff could not have attended the assessment prior to the May 16, 2002 hearing. Evidence is "material" if there is a "reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered." Id. (internal quote marks omitted.) I find it quite unlikely that the ALJ would have reached a

Case 2:04-cv-01043-LA   Filed 12/14/05   Page 23 of 30   Document 24

Second, plaintiff contends that ALJ O'Grady interrupted and frustrated the testimony of his father at the May 16, 2002 hearing. He claims that despite his father's own, memory-related disability, the ALJ required his father to remember exact dates. He further states that after his father's "abrupt departure" the ALJ questioned him about his father's condition; he states that she should have thereafter recalled his father in order to complete the record and allowed him to testify "in an unimpeded fashion." (R. 14 at 4.)

The record shows that the ALJ did not prevent plaintiff's father from testifying. At the hearing, plaintiff's lawyer was asking plaintiff's father about plaintiff's condition in the past year. Plaintiff's father stated:

A    Why is it essential to the last year, if I may ask?

Q    Because we are –

A    I feel –

ALJ:  Sir, either answer the question or you will be excused. The Attorney's asking you a question, it's not up to you to object to it.

WIT:  That's fine, then, I'll be excused if I can't answer the way I want to, Your Honor, okay. I've got my own set of problems, all right, that relate to my disability. There will be an appeal on your actions, Your Honor.

ALJ:  Sir –

WIT:  Excuse me.

_____

different conclusion had she considered the Aurora report, a pre-printed form, based on a single visit, which does not clearly state that plaintiff is disabled. Attached to the report is a prescription note for Paxil. Again, this does not demonstrate that plaintiff is disabled, and the ALJ knew that plaintiff had been prescribed Paxil before. Thus, I see no reason to remand the matter based on this report. For the same reasons, I cannot conclude that the ALJ's refusal to consider the report (again, assuming she received it before the decision issued) was anything more than harmless error. See Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error doctrine to Social Security disability decision).

24

ATTY: Okay

ALJ: All right. If, I mean, I don't think it's appropriate for a witness to be objecting to a particular question.

ATTY: I understand.

ALJ: And he was brought here at your request, [counsel], he was here to testify regarding the Claimant. If he doesn't want to cooperate, he doesn't want to participate, and if he's going to walk out in a huff then there's nothing we can do. We'll have to proceed with the hearing.

ATTY: I understand.

(Tr. at 422-23.)

The ALJ attempted to direct plaintiff's father's testimony such that it was responsive to the questions; she did not cut off his testimony; and it was plaintiff's father who decided to "walk out in a huff." The ALJ has substantial discretion in her conduct of the hearing, see, e.g., Mullen v. Bowen, 800 F.2d 535, 541 (6th Cir. 1986); Watson v. Barnhart, No. 03-0552, 2003 U.S. Dist. LEXIS 13617, at *5 (N.D. Cal. Aug. 4, 2003), aff'd, 126 Fed. Appx. 788 (9th Cir. 2005), and I cannot conclude that such discretion was abused in this case.[11]  Even if the ALJ did err in interrupting plaintiff's father, plaintiff has pointed to no gap in the record based on her actions.  See Cannon, 213 F.3d at 977-78 (affirming where plaintiff failed to identify any evidence that was not obtained or how a lack of evidence prejudiced her, and stating that mere conjecture or speculation that additional evidence might have been obtained was insufficient to warrant remand).  Moreover, plaintiff's father testified fully at previous

_____

[11]I note that plaintiff's counsel did not object to the ALJ's actions at the hearing or ask to recall plaintiff's father, which likely forfeits the issue for review in this court. Cf. Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004) (finding that counsel's failure to question basis for VE's testimony forfeited issue); Donahue v. Barnhart, 279 F.3d 441, 447 (7th Cir. 2002) ("Raising a discrepancy only after the hearing, as Donahue's lawyer did, is too late.  An ALJ is not obliged to reopen the record.").

25

hearings, and the ALJ had before her the records of those proceedings. Therefore, the ALJ did not commit reversible error in this respect.[12]

Third, plaintiff claims that after the May 16, 2002 hearing he attempted, without success, to obtain copies of the hearing transcripts in order to have the hearing re-opened and/or to assist in his appeal to the Appeals Council. He states that he did not receive the transcripts until after his action was filed in this court. (R. 14 at 4-5.)

Plaintiff does not, even now that they have been prepared, explain what in the transcripts he needed to re-open the hearing or obtain review from the Appeals Council. Nor does he cite any authority for the proposition that he was entitled to have the tapes transcribed prior to the filing of this action. Therefore, this argument fails.

## C.    Plaintiff's Argument in Reply

In his reply brief,[13] plaintiff makes several additional arguments. However, arguments presented for the first time in a reply brief are waived. James v. Sheahan, 137 F.3d 1003, 1008 (7th Cir. 1998). Even if I did consider such arguments, plaintiff would not be entitled to reversal and remand.

First, plaintiff contends that the ALJ did not determine whether he was capable of working on a regular and continuing basis, i.e. eight hours per day, five days per week. (R.

_____

[12]In his reply submission, plaintiff argues that the ALJ failed to accommodate his father's memory-related disability. (R. 23 at [un-paginated] 2.) However, even assuming that plaintiff's father has such a disability, the ALJ did not require him to display perfect memory; she simply required him to answer the questions asked. After plaintiff's father left the hearing room "in a huff," the ALJ was simply not required to schedule yet another supplemental hearing.

[13]Plaintiff labeled the document "Plaintiff's Statement in Lieu of Reply Brief." (R. 23.)

23 at [un-paginated] 2.) However, plaintiff points to no evidence in the record demonstrating that he could not work on a regular and continuing basis. Nor does he explain why the ALJ's failure to make a specific finding on this issue constituted any more than harmless error. See Keys, 347 F.3d at 994-95. The ALJ obviously concluded that plaintiff could work on a full-time basis given her findings, and in analyzing an ALJ's opinion for fatal gaps or contradictions I must give it a commonsensical reading rather than nitpicking at it. Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000).

Second, plaintiff argues that the ALJ erred by not considering his propensity for violence with co-workers into her decision. He notes the VE's testimony that there are no jobs where there is absolutely no contact with co-workers. He also argues that the ALJ failed to develop the record by questioning the VE on this statement. (R. 23 at [un-paginated] 3.) However, the ALJ accommodated plaintiff's alleged inability to get along with others by restricting him to jobs with limited interaction with co-workers and no public contact. Plaintiff points to no evidence in the record that he required a greater restriction.[14] While plaintiff and his father did testify about, and the record contained evidence of, plaintiff's unruly behavior, the ALJ reasonably concluded that the medical evidence and other facts of record did not demonstrate a greater limitation. (Tr. at 14.) The ALJ need not question the VE about every limitation alleged by the claimant, only those supported by the medical evidence. Ehrhart v. Sec'y of HHS, 969 F.2d 534, 540 (7th Cir. 1992). In the present case, the ALJ concluded that, based on the medical evidence, plaintiff was not

_____

[14]I note that in his testimony at the April 5, 2001 hearing, plaintiff testified that his primary problem was motivating himself to get to work, and that once he got there he was able to get through the day. (Tr. at 472-73; 488.)

27

precluded from all contact with others. Finally, plaintiff was represented at the hearing, and his counsel was able to question the VE on any topic she wished. See Ragsdale v. Shalala, 53 F.3d 816, 819 (7th Cir. 1995) ("There currently exist sufficient procedural measures to bring out the vocational expert's thought process. For example, the claimant could question the vocational expert on cross-examination, pose his own hypothetical questions, or request the ALJ to pose interrogatories to the vocational expert, in each case challenging the vocational expert to explain and expand upon the basis of his response to the ALJ's hypothetical question."). In sum, plaintiff has not shown that the ALJ failed to develop the record by questioning the VE further.

Third, plaintiff argues that the ALJ failed to properly consider Dr. Matusiak's opinions or to have another psychiatrist give comparable testimony. (R. 23 at [un-paginated] 3-4.) However, the ALJ did discuss Dr. Matusiak's opinions (Tr. at 12-13), and while her discussion could have been more detailed, I cannot conclude that this failure was more than harmless error. Plaintiff points to nothing in the records that the ALJ failed to discuss that could have changed the result, nor is anything apparent. In his initial assessment in 1995 (when he may have been a treating source, as that term is defined by the SSA), Dr. Matusiak found plaintiff's personality test responses "essentially unremarkable." (Tr. at 359.) He concluded that despite plaintiff's father's hope that plaintiff's conduct was based on a brain disorder, the real problem was plaintiff himself, who had to "first recognize the negative ramifications of his conduct and make a meaningful commitment to change." (Tr. at 361.) This was consistent with the opinion of Dr. Hischke, who testified at the February 23, 1998 hearing, with which plaintiff's father agreed. (Tr. at 539-40.) Later, in a "To Whom It May Concern" letter drafted in February 2000, Dr. Matusiak wrote that plaintiff "seems unable to

28

sustain any form of employment or purposeful activity." (Tr. at 139.) However, there is no indication in the record that Dr. Matusiak was treating plaintiff at that time; rather, it appears that he treated plaintiff for a brief period "several years ago." (Tr. at 139.) When he saw plaintiff in 2000, it was "for evaluation purposes only." (R. 23 at [un-paginated] 3.) Thus, it does not appear that Dr. Matusiak was in 2000 a treating source whose opinion was entitled to special consideration. 20 C.F.R. § 404.1502 (stating that a treating source must see, or have seen, the claimant with a frequency consistent with accepted medical practice, and that a doctor is not a treating source if he is seen only to obtain a report in support of the disability claim). It is clear that the ALJ elected to give greater weight to the report of Dr. Brigham in light of the entire record (Tr. at 13), which I cannot conclude was unreasonable.

As far as plaintiff's claim that the ALJ should have called another expert to testify, I note that ALJ O'Grady did adjourn the hearing to obtain a psychiatric consult, the second obtained at the expense of the SSA, in addition to the medical expert who testified at the 1998 hearing. See Henderson by Henderson v. Apfel, 179 F.3d 507, 513 (7th Cir. 1999) (holding that ALJ did not err in not eliciting testimony from a medical advisor where ALJ already had an extensive medical history before him). Further, the determination of how much evidence to gather is a subject on which the court must respect the ALJ's reasoned judgment. Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993). As the Seventh Circuit has noted, "it is always possible to do more." Id.

> Judicial review of administrative decisions is deferential. A decision supported by substantial evidence must be enforced. When conducting trials in their own courtrooms, judges may indulge a preference for "more" – although most do not, recognizing that cumulative evidence rarely repays the costs of gathering and presenting it. When reviewing proceedings conducted by others, district judges must respect the authority of administrative officials to decide how much is enough. [Plaintiff] has received plenty and to spare.

29

<u>Id.</u>

## VI.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**, and

this case is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 14th day of December, 2005.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge